**In re JIFFY LUBE SECURITIES LITIGATION.**

**Civ. A. No. Y–89–1939.**

United States District Court, D. Maryland.

Aug. 13, 1991.

---

John Isbister, Baltimore, Md., Bruce E. Gerstein, New York City, and Steven J. Toll, Washington, D.C., for plaintiffs.

Wilbur D. Preston, Jr. and Fenton L. Martin, Baltimore, Md., for defendant Ernst & Young.

John Henry Lewin, Jr., Baltimore, Md., for defendants Jiffy Lube Intern., Inc., Edward F. Kelley, III and Eleanor C. Harding.

Joseph D. Cheavens, Houston, Tex., for defendant Pennzoil Co.

Terence P. Quinn, Sr., Washington, D.C., for W. James Hindman.

Charles S. Fax, Baltimore, Md., and Stephen W. Greiner, New York City, for the underwriter defendants.

## MEMORANDUM

JOSEPH H. YOUNG, Senior District Judge.

Ernst & Young seeks dismissal of the second amended complaint (hereinafter "the complaint" or "the second amended complaint"). The basis of the complaint is that Ernst & Young audited Jiffy Lube International's ("JLI" or "the company") annual financial statements and issued reports assuring members of the investing public that such statements presented JLI's financial position in accordance with generally accepted accounting principles, when, in fact, it knew that it was not and that the annual and quarterly reports and Form 10–Ks and Form 10–Qs were materially false. As a result, the market price was artificially inflated during the Class Period. It was not until June 9, 1989, when JLI reported a loss of approximately $32 million for its fiscal fourth quarter, ending March 31, 1989, that the public became aware of JLI's finances.

*Section 11 and Section 10(b).*

Ernst & Young maintains that the Jiffy Lube shareholders ("plaintiffs") did not satisfy the pleading requirements for a section 11 and section 10(b) claim because they "d[id] not identify the misrepresentations or misstatements attributable to defendant with sufficient specificity to withstand a motion to dismiss." (citing Court's Memorandum Op. on Motion to Dismiss First Complaint at 7). It alleges that the plaintiffs did not comply with this Court's ruling.

For the purposes of a motion to dismiss, the material allegations of the complaint are to be taken as admitted. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969). To state a claim under section 11, plaintiffs must allege facts showing (1) an untrue statement or omission of (2) a material (3) fact (4) made by Ernst & Young. *See* 15 U.S.C. § 77k (Section 11); *In re Worlds of Wonder Securities Litigation,* 694 F.Supp. 1427 (N.D.Ca.1988). Section 11 sounds in negligence, not fraud and, therefore, is not subject to the particularity requirements of Fed.R.Civ.P. 9(b). *Newcome v. Esrey,* 862 F.2d 1099, 1106 (4th Cir.1988); *Steiner v. Southmark Corp.,* 734 F.Supp. 269, 278 (N.D.Tex.1990); *Bernstein v. Crazy Eddie, Inc.,* 702 F.Supp. 962, 973 (E.D.N.Y.1988), *vacated in part on other grounds,* 714 F.Supp. 1285 (E.D.N.Y.1989). Plaintiffs need not prove privity, reliance, causation or scienter in order to recover under Section 11. *In re Gap Stores Securities Litigation,* 79 F.R.D. 283, 297 (N.D.Ca.1978).

To state a cause of action under section 11, plaintiffs must identify (1) the registration statement which contains the misrepresented information that is expressly attributed to the accountant; and (2) describe the misrepresented data which is attributed to the accountant's audit, if the claim is for misrepresentation; or (3) describe the affirmative statement that is made misleading by the alleged material omission, which is attributed to the accountant's audit, if the claim is for a material omission. Dismissal Memorandum at 5.

When pleading section 10(b) and Rule 10b–5, Fed.R.Civ.P. 9(b) provides that "[i]n all averments of fraud or mistake the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." The pleading requirement for Rule 9(b) is less stringent in regard to facts particularly within the knowledge of the opposing party and, therefore, "malice, intent, knowledge and other conditions of the mind of a person may be averred generally." Fed.R.Civ.P. 9(b). To prevail, a plaintiff must establish six elements: (1) a false representation of (2) a material (3) fact; (4) defendants knowledge of its falsity and his intention that plaintiff rely on it; (5) the plaintiff's reasonable reliance thereon; and (6) his resultant loss. *See Peil v. Speiser,* 806 F.2d 1154, 1160 (3rd Cir.1986); *Cammer v. Bloom,* 711 F.Supp. 1264, 1276 (D.N.J.1989) (citing 3 Loss, *Securities Regulation* 1431 (1961)).

Courts in this circuit have adopted a less strict application of Rule 9(b), requiring only that fraud actions are to state with particularity the circumstances constituting the fraud. "Circumstances" refers to such matters as "the time, place and contents of the false representations, as well as the identity of the person making the misrepresentations and what was obtained thereby." *Windsor Ass'n, Inc. v. Greenfeld,* 564 F.Supp. 273, 280 (D.Md. 1983) (quoting C. Wright and A. Miller, *Federal Practice and Procedure,* § 1297, 400, 403 (1969)). *See Oliver v. Bostetter,* 426 F.Supp. 1082, 1089 (D.Md.1977) ("[r]ule 9(b) requires particularity in the pleading of the 'circumstances' of the fraud; that is, the rule requires presentation of the situation out of which the claim arose."); *Pridgen v. Farmer,* 567 F.Supp. 1457, 1459 (E.D.N.C.1983) (citing *Clark v. Cameron–Brown Co.,* 72 F.R.D. 48, 62 (M.D.N.C.1976) ("[a] balance must be struck, protecting defendants from damaging but lightly made charges of fraud while protecting plaintiffs from pleading complex 'evidence'."); *Copiers Typewriters Calculators v. Toshiba Corp.,* 576 F.Supp. 312, 327 (D.Md.1983) ([t]he requirement of "particularity ... does not require the elucidation of every detail of the alleged fraud, but does require more than a bare assertion that such a cause of action exists.").

### 1. *The March 31, 1986 Statement.*

Ernst & Young argues that the allegations regarding the 1986 statement are conclusory. It states that although plaintiffs referenced the inadequacy of the allowance for doubtful accounts, ¶¶ 50, 154(b), 154(f), 164, 175, 177, they did not allege a factual basis for this conclusory statement. It contends that the complaint merely suggests that JLI's income as of March 31, 1986 was overstated because JLI booked initial franchisee fees and area development fees received from "undercapitalized franchisees" as income. It argues that no figures are presented, no dates set forth and no facts are alleged regarding the "undercapitalization" of franchisees. Complaint, ¶¶ 50, 52, 175, 177. Furthermore, Ernst & Young argues that there is no description, identification or specific facts in existence as of March 31, 1986 which was misrepresented on or omitted from that statement and plaintiffs did not adequately identify any.

Fed.R.Civ.P. 9(b) states that "the circumstances constituting fraud ... shall be stated with particularity." "Overstatements of accounts receivable or net sales, without more, are merely 'neutral facts' from which no inference of impropriety logically flows." *Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 523 (S.D.N.Y.1977). "Economic prognostication, though faulty, does not, without more, amount to fraud." *TCF Banking & Savings, F.A. v. Arthur Young & Co.,* 706 F.Supp. 1408, 1412 (D.Minn.1988).

Similarly, general allegations that an auditor has violated generally accepted accounting principles ("GAAP") does not give rise to an inference of fraud. *See id.* (10(b) claim against auditor dismissed because allegations that audit reports failed to comply with applicable auditing and accounting standards by understating the amount of bad debt reserves does not satis-

fy the requirements of Rule 9(b)); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990) (court ruled that, although defendant's mental state need not be pleaded with particularity, "the complaint must still afford a basis for believing that plaintiffs could prove scienter" and affirmed dismissal of complaint); *Robin v. Arthur Young & Co.*, 915 F.2d 1120 (7th Cir.1990) (affirmed dismissal of complaint despite allegations "that Arthur Young had knowledge that the prospectus was false and misleading and that Arthur Young knowingly and intentionally aided and abetted the primary violators" because "it alleges no facts to show how Arthur Young knew that the basis for its decision to issue an unqualified report was no longer sound.").[1]

■ The 1986 Prospectus and JLI's Annual Report for the fiscal year ending March 31, 1986 included a report from Ernst & Young, certifying that the year-end financial statement presented fairly the consolidated financial position of JLI and its subsidiaries and the consolidated results of their operations and changes in its financial position in conformity with GAAP. (Complaint, ¶¶ 48, 55). Plaintiffs state that the 1986 materials were deceptive and materially false and misleading when made because Ernst & Young knew that JLI had lent certain of its franchisees large amounts of capital, without which the franchisees could not survive. In return, these franchisees gave JLI substantial Area Development Fees and Initial Franchise Fees which JLI booked as revenues. Because Ernst & Young knew that these undercapitalized franchises were experienc-

ing serious operational and financial difficulties, it was aware that the substantial monies loaned by JLI to them were improperly recorded on JLI's books and records as assets without an adequate allowance for doubtful accounts. (Complaint, ¶¶ 50, 56).

The complaint alleges that JLI, with the approval and acquiescence of Ernst & Young, recorded allowances for doubtful accounts in the amount of $299,097 in the 1986 financial statement, which was significantly understated given the financial difficulties of JLI's franchisees. Therefore, Ernst & Young's unqualified opinions were not in conformity with GAAP due to the fact that JLI's accounts receivable were materially overstated as a result of its failure to establish adequate allowances for doubtful accounts. (Complaint, ¶¶ 51, 56, 154(a)–(f)). The complaint also alleges that Ernst & Young knew, through its receipt of monthly franchisee reports, that the initial franchise fees and area development fees, which JLI booked as income would never be received due to operational and financial difficulties. Therefore, JLI's reported revenues and net income figures for fiscal 1986 were inflated.

Plaintiffs have identified the 1986 Prospectus and JLI's Annual Report for the fiscal year ending March 31, 1986 as the source of the misrepresented data. (Complaint, ¶¶ 56, 174, 187). The complaint also identifies defendant's misstatements and source of omissions—Ernst & Young's unqualified opinion certifying that the year-end financial statement presented fairly the consolidated financial position of JLI and its subsidiaries in conformity with

---

**1.** E & Y cite to *Gollomp v. MNC Financial, Inc.*, 756 F.Supp. 228 (D.Md.1991), where plaintiffs brought a section 10(b) claim against MNC Financial, Inc. ("MNC"). The complaint alleged that MNC failed to set aside appropriate loan loss reserves on real estate loans when "MNC knew that many of its real estate loans were unlikely to perform," thereby inflating earnings in its quarterly and annual reports. In addition, the plaintiffs alleged that, during 1988 and 1989, MNC "touted its loan portfolio as healthy and the Baltimore–Washington real estate market as fundamentally sound." *See* J. Motz's Memorandum Op. at 2. (Exhibit A). J. Motz concluded that "[t]he need to make a substantial increase in loan loss reserves at any given time may, at

the least, derive as much from mismanagement as from fraud", however, [n]one of these facts are sufficient to support the conclusory averment that defendants acted fraudulently, *i.e.* that they did something more than mismanage the affairs of the bank or err in projecting the performance of its loans." *Id.* at 7. However, the Court found that the only facts in that case were the substantial increase in loan loss reserves at the end of the class period, the substantial decrease in the value of the bank's stock on the same day and the inherent contradiction between the bank's representations that it was "conservatively" managed and the deterioration of its loan portfolio. *See id.* at 7. There is more to this complaint, discussed below.

GAAP. (Complaint, ¶¶ 48, 56). It also explains that the reason the materials were deceptive and materially false was because the financial statements were not presented in conformity with GAAP or GAAS. (Complaint, ¶¶ 50, 56).

The facts, as alleged, adequately meet the more lenient requirements of a § 11 claim. The complaint identified the registration statement which contains the misrepresented information that is expressly attributed to the accountant and described the misrepresented data which is attributed to the accountant's audit, if the claim is for misrepresentation, or described the affirmative statement that is made misleading by the alleged material omission which is attributed to the accountant's audit, if the claim is for a material omission.

The complaint also meets the 10(b) requirements. It explains why JLI's financial statements for fiscal year 1986 were not in conformity with GAAP and GAAS, i.e., (1) the facts surrounding JLI lending certain of its undercapitalized franchisees significant amounts of capital which were necessary for the survival of these franchises and Ernst & Young's knowledge that a large portion of these fees would not be recovered. (Complaint, ¶¶ 50–52); and (2) the allowance for doubtful accounts was listed as $299,097—a significant understatement given the financial difficulties of JLI's franchisees. The complaint alleges that, with all this in mind, JLI's accounts receivables were materially overstated. This rendered Ernst & Young's unqualified opinion regarding the 1986 financial statements' conformance with GAAP materially false. (Complaint, ¶¶ 50–52, 154).

The complaint also describes what principles of GAAP and GAAS were violated and why. (Complaint, ¶¶ 161–164). Plaintiffs have adequately plead with particularity their 10(b) claim. No more is necessary. Fed.R.Civ.P. 9(b) "does not require nor make legitimate the pleading of detailed evidentiary matter." *Walling v. Beverly Enterprises*, 476 F.2d 393, 397 (9th Cir. 1973); *accord Michaels Bldg. Co. v. AmeriTrust Co. N.A.*, 848 F.2d 674, 680 n. 9 (6th Cir.1988). The complaint does not allege mere "economic prognostication." *See TCF Banking, supra.*

Ernst & Young also maintains that the complaint should be dismissed because there is no allegation that any named plaintiff or prospective class member ever actually read or relied on the 1986 offering materials themselves and none of the "exceptions" applies to plaintiffs here. Reliance will be discussed, *infra.*

### 2. *March 31, 1987 Statement.*

The complaint alleges that JLI's new franchise, "New Lone Star" was created on March 27, 1987. (Complaint, ¶ 61). New Lone Star was formed through a series of acquisitions. (Complaint, ¶¶ 62–73). In December 1986, JLI, Express Lube Oil Ltd. and B.A.T.H. Partnership (a general partnership in which Hindeman had a substantial equity interest), entered into a Memorandum of Agreement ("Memorandum") to organize New Lone Star and to provide for the sale of assets acquired by JLI, as described, to New Lone Star. The complaint explains how this would occur. (Complaint, para. 76–83). On March 26, 1987, JLI, Express Lube and B.A.T.H. entered into a Purchase and Consolidation Agreement, which, although similar to the Memorandum, ascribed values to the assets contributed by the parties to the transaction which were greater than in the Memorandum. The number of shares of New Lone Star stock given to each party to the Agreement, however, did not change, despite the fact that the relative value of their contributions did change. (Complaint, ¶¶ 84–85). The complaint alleges that Ernst & Young was aware of differences in value of the contributed assets and was aware, or was reckless in not knowing, that the value ascribed to these assets was arbitrary, and was not a reliable indication of their fair market value. (Complaint, ¶ 86).

The complaint alleges that Ernst & Young counseled JLI against being sole owner, with Express Lube, of New Lone Star, because it would mean that JLI would own in excess of 20% of the voting stock of New Lone Star, thereby requiring JLI, under GAAP, to reduce its income by a per-

centage of any losses sustained by New Lone Star equal to JLI's equity interest in New Lone Star (the "Equity Method of Accounting"). The complaint alleges that, in order to circumvent the GAAP requirement and conceal JLI's actual violation of the requirement, Ernst & Young advised JLI to utilize B.A.T.H. in the transaction. Since both B.A.T.H. and JLI were under control of Hindeman, B.A.T.H. acted as JLI's "alter ego" in the transaction. As a result, the complaint alleges, B.A.T.H. was substituted for JLI at the advice and recommendation of Ernst & Young to avoid the GAAP reporting requirement. (Complaint, ¶¶ 87–89).

The complaint alleges that, as a result of the New Lone Star transaction, JLI was able to improperly recognize area development fees of $935,000, franchise fees of $90,000 and a gain on the sale of assets of $658,998. This income (after taxes) equalled almost the entire net income reported by JLI for the fourth quarter of fiscal 1987 and represented approximately 24% of JLI's pre-tax income in fiscal 1987. (Complaint, ¶ 99). Therefore, the 1987 financial statement materially overstated net income for the fourth quarter and fiscal year ending March 31, 1987. (Complaint, ¶ 100).

The complaint alleges that the Notes to the JLI's Consolidated Financial Statements for 1987 also omitted relevant material facts regarding the New Lone Star transaction. (Complaint, ¶ 107). Yet, Ernst & Young gave its unqualified opinion certifying that the year end financial statements and accompanying notes presented fairly the consolidated financial position of JLI and subsidiaries and the consolidated results of their operations and changes in financial position in conformity with GAAP. (Complaint, ¶ 101). This unqualified opinion for the fiscal 1987 financial statements was included in the 1987 10–K, 1987 Annual Report and the July 1, 1987 Prospectus. (Complaint, ¶¶ 101–109, 116–120).

The complaint states that the 1987 materials were deceptive and materially false and misleading when made because Ernst & Young knew that JLI had lent certain of its troubled franchisees large amounts of capital. As these accounts receivables grew and the receipt of full payment on these receivables became more doubtful, JLI, with the review, approval and acquiescence of Ernst & Young, inadequately established allowances for doubtful accounts. Ernst & Young had access to franchisee reports and so it was aware, or was reckless in not knowing, of the operational and financial difficulties of these franchises. (Complaint, ¶ 154).

Ernst & Young argues that the plaintiffs have not alleged facts to support the inference that Ernst & Young knew that the values negotiated and ascribed by Express Lube and JLI to the assets contributed by JLI to New Lone Star were false. It states that the fact that Ernst & Young provided advice to JLI in connection with the structure of New Lone Star and the potential application of the equity method of accounting does not, in and of itself, indicate fraud. Ernst & Young was providing professional services and it argues that "[p]laintiffs have pled no more than an agreement by Ernst & Young to provide professional services...." *In re Wyse Technology Securities Litigation,* 1990 WL 169149, 1990 U.S.Dist.Lexis 14742, [1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) para. 95,509 1990 U.S. District Court, Lexis 14752 (N.D.Cal. Sept. 13, 1990).

The complaint identifies the misstatements and source of omissions. (Complaint, ¶¶ 101, 120, 174). It recognizes the 1987 offering materials as the source of misrepresentations and omissions and indicates misstatements of material fact and omitted material information in Ernst & Young's unqualified opinion that JLI's 1987 statements were prepared in conformity with GAAP as the affirmative statements by Ernst & Young. This is sufficient for a § 11 claim.

For the purposes of a 10(b) claim, the complaint explains the reasons why the 1987 financial statements were not presented in conformity with GAAP or GAAS. It details the formation of New Lone Star and the apportionment of New Lone Star stock

to the three shareholders. It also explains the differences between the Memorandum of Agreement and the Purchase and Consolidation Agreement, through which the ownership of New Lone Star was formulated. It also alleges that there are discrepancies between the value of assets contributed by the parties to New Lone Star in the two agreements, making it obvious that the values ascribed to these assets were arbitrary, and were not a reliable indication of their fair market value. Although these allegations may at first seem conclusory in nature, the complaint alleges that the purpose and effect of structuring New Lone Star this way was to avoid the Equity Accounting method under GAAP. (Complaint, ¶¶ 89–92).

The complaint also specifies the precise amounts of fees and income which JLI was able to improperly recognize in regard to the New Lone Star transaction and its corresponding overstatement of income for the fourth quarter and fiscal year ending March 31, 1987. (Complaint, ¶ 99). It also explains that Ernst & Young's unqualified opinion for fiscal 1987 was materially false and misleading because there were inadequate allowances for doubtful accounts established for numerous other troubled franchisees to whom JLI had lent large amounts of capital. (Complaint, ¶ 154).

Finally, the complaint also specifies which of GAAP and GAAS principles were violated and why they were violated. (Complaint, ¶¶ 161–164). The complaint states why and to what extent JLI's 1987 income was inflated. (Complaint, 99–100, 103). And since it is not necessary to plead the exact amount by which a defendant allegedly overstated income, the allegations are sufficient. *See Bernstein, supra,* 702 F.Supp. at 975; *Klein v. King, et al.,* [1989–90 Transfer Binder] Fed.Sec.L.Rep. (CCH) 95,002 at 95,608, 1990 WL 61950 (N.D.Cal.1990) ("the plaintiff is not required to plead a precise dollar amount in order to state a claim under Rule 10b–5").

### 3. *The March 31, 1988 Statement.*

The complaint alleges that JLI acquired nine quick lube centers from 10 Minute Pit Stop USA, Inc. ("Pit Stop") and sold eight of them to New Lone Star for $1.6 million in interest-bearing notes. It states that JLI provided total financing for the New Lone Star's acquisition and also provided economic concessions. (Complaint, ¶¶ 110–111, 113, 114). The complaint alleges that New Lone Star was a financial disaster, showing a net loss of $1,314,089 for its first six months of operation. (Complaint, 138–39). Despite this, in May 1987, JLI agreed to waive its policy of requiring personal guarantees on the performance by New Lone Star of its obligations under license and area agreements, thereby jeopardizing the recoverability of those obligations. (Complaint, ¶ 142). It was not until the end of September 1988 that JLI established any reserve for doubtful accounts for New Lone Star. (Complaint, ¶ 143). Yet for the fiscal year ending March 31, 1989, JLI wrote off $7.85 million of New Lone Star's debt to JLI and took a $12.2 million charge relating to the resizing of Lone Star. (Complaint, ¶ 147).

The complaint gives specific reasons for JLI's overstated quarterly and annual net income (or losses) for the period of April 1, 1987 through December 31, 1988. (Complaint, ¶ 149) and claims that Ernst & Young knew or was reckless in not knowing of these factors because of its familiarity with the New Lone Star transaction and the availability of the monthly New Lone Star financial reports. (Complaint, ¶ 150). In addition, plaintiffs allege that Ernst & Young knew that JLI's assets were overstated by virtue of the fact that its workpapers reveal that the financial statement balances of the accounts and notes receivable, reflected in JLI's audited consolidated balance sheet as of March 31, 1988, exceeded the balances reflected in JLI's underlying detailed accounting records by $9.9 million. Plaintiffs allege that JLI could not have reasonably anticipated realization of this sum because it could not identify the parties which were purportedly indebted to it. Nevertheless, the complaint states that Ernst & Young failed to write off the unreconciled differences as a charge to operations and, instead proposed to provide an

additional general reserve of only $191,359. (Complaint, ¶¶ 152–53).

The complaint also alleges that Ernst & Young knew of JLI's loans to troubled franchises and JLI's inadequate allowance for doubtful accounts. For example, in March 1988, Ernst & Young was aware that *San Diego Lubricants* had an outstanding debt to JLI of over $1.1 million as the result of certain notes given to JLI. Plaintiffs argue that although Ernst & Young noted, in its workpapers, that the franchise was exhibiting severe cash flow problems, had fully utilized its credit line with JLI, and that the owners of the franchise were unwilling to make further investments in the franchise, it did not have JLI add corresponding reserves to its allowance for doubtful accounts for fiscal year 1988. (Complaint, ¶ 154). On January 1, 1989, JLI had to acquire the assets and assume the liabilities of San Diego Lubricants, writing off $1.2 million. (Complaint, ¶ 154).

Ernst & Young argues that none of the allegations pertaining to failings on behalf of Ernst & Young support a 10(b) cause of action: [2]

### Pit Stop

The complaint alleges that JLI recognized $338,750.00 in pre-tax income for the quarter ended June 30, 1987 from its purchase of Pit Stop centers and their transfer to New Lone Star in exchange for notes whose "collection could not reasonably be assumed." (Complaint, ¶ 115). Ernst & Young argues that this is a conclusory statement and states that even if collection could not reasonably be assumed, no basis is given for measuring whether this alleged nonconformity with GAAP is material. It argues that plaintiffs do not state, nor provide any basis for assuming, that the net

income from Pit Stop, is a materially false statement.

As stated above, pleading the exact amount of certain overstatements of income or the amount by which reserves for doubtful accounts were understated, is unnecessary at this stage. The complaint describes New Lone Star's acquisition of Pit Stop, the corresponding economic concessions to New Lone Star and JLI's resultant erroneous recognition of fees and income in fiscal 1988. (Complaint, ¶ 110–114). It also details the New Lone Star's financial distress during fiscal 1988 and JLI's corresponding failure to establish any reserves for doubtful accounts for New Lone Star until September 30, 1988.

### The $9.9 Unidentified Accounts

Plaintiffs allege, in paragraphs 152 and 153 of the complaint, that Ernst & Young's workpapers reflect a knowledge that JLI's "underlying detailed accounting records" did not identify $9.9 million of the accounts and notes receivable balance reflected as assets on the balance sheet of March 31, 1988. The plaintiffs conclude that JLI "could not reasonably anticipate" to collect them, and that Ernst & Young only "proposed that JLI provide an additional general reserve of only $191,359" against their noncollection.

Ernst & Young argues that this allegation is deficient to support a § 10(b) fraud claim for a number of reasons which amount to pleading evidence.[3] This is not required at the motion to dismiss stage. Plaintiffs have satisfactorily alleged a § 10(b) claim.

### Reliance

Reliance is an essential element of a 10(b) claim that must be pleaded and proved by plaintiffs. *Basic, Inc. v. Levin-*

---

**2.** Plaintiffs do not allege § 11 claim.

**3.** (1) There is no allegation that the accounts did not exist—only that they were not identified adequately; (2) No factual basis is provided for the conclusion that JLI could not "reasonably anticipate" collection, i.e. that the accounts were then due and payable but not being paid, so that collection efforts were necessary, that the debtors themselves somehow knew JLI's records were deficient, or that the accounts were not paid when due; (3) There is no allegation of why a $191,359 reserve was inadequate under

applicable accounting standards; (4) There is no allegation that E & Y did not receive a satisfactory explanation for what at time of first discovery may have appeared to be a questionable item; (5) The curious language employed in para. 153—that E & Y "proposed" a reserve of $191,359—leaves the reader at sea as to what actually happened; (6) Nothing in the allegations support a conclusion that the balance sheet balance, if overstated, was overstated for *fraudulent* purposes.

*son*, 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988). The reliance requirement need not be met, in all circumstances, by showing actual reliance. A rebuttable presumption of reliance arises in cases involving omissions of information, rather than misrepresentation of fact, *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972), in cases in which there has been a fraud-on-the-market allegation, *Basic, supra*, 485 U.S. at 245–47, 108 S.Ct. at 990–92, and there is some authority that such a rebuttable presumption arises where fraud created the market, *Freeman v. Laventhol and Horwath*, 915 F.2d 193, 199–200 (6th Cir.1990).

Plaintiffs contend that the *Affiliated Ute* presumption of reliance may be presumed since it has presented facts indicating omissions on the part of Ernst & Young.

> The categories of "omission" and "misrepresentation" are not mutually exclusive. All misrepresentations are also nondisclosures, at least to the extent that there is a failure to disclose which facts in the representation are not true.

*Little v. First California Co.*, 532 F.2d 1302, 1304 n. 4 (9th Cir.1976). Therefore, some courts have found that in cases involving a mixture of omissions and misrepresentations, the presumption of reliance is appropriate and the burden of rebuttal shifts to the defendants. *See Sharp v. Coopers & Lybrand*, 649 F.2d 175 (3rd Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982); *Worlds of Wonder Securities Litigation*, [1989–90 Transfer Binder] Fed.Sec.L.Rep. (CCH), 95,004 at 95,628, 1990 WL 61951 (N.D.Cal. 1990); *In re Home–Stake Production Co. Securities Litigation*, 76 F.R.D. 351, 371 (N.D.Okla.1977).

The complaint alleges both omissions and nondisclosures. This satisfies the *Affiliated Ute* presumption of reliance under *Little*. Accordingly, the burden of rebuttal shifts to the defendants.

Defendant's motion is denied.